

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**WICHITA FALLS DIVISION**

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

AUG 2 2 2005

CLERK, U.S. DISTRICT COURT
By _____
          Deputy

| | |
|---|---|
| JAMES A. BRYANT, AS NEXT FRIEND OF BOBBY JAMES LEE BRYANT, A MINOR; SYBIL SANCHEZ, TEMPORARY ADMINISTRATRIX OF THE ESTATE OF AMANDA BRYANT, DECEASED; SYBIL SANCHEZ, INDIVIDUALLY; BOB LEMMONS & LLOYD LIZAKOWSKI, <br><br> PLAINTIFFS, <br><br> V. <br><br> GIACOMINI, S.p.A., <br><br> DEFENDANT. | § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> **Civil Action No.  7-04CV-114-R** <br> **(Jury)** |

## JOINT MOTION SUBMISSION

The following documents are submitted in compliance with the Scheduling Order dated December 9, 2004.

TAB A        Defendant Giacomini, S.p.A.'s Motion for Summary Judgment and Brief in Support Thereof

TAB B        Plaintiffs' Response to Motion for Summary Judgment

TAB C        Defendant Giacomini S.p.A.'s Reply to Plaintiffs' Response to Defendant's Motion for Summary Judgment

TAB D        Joint Appendix.

Respectfully submitted,

John W. Weber, Jr.
State Bar No.  21046500
Joseph A. Bourbois
State Bar No.  00790342
Fulbright & Jaworski L.L.P.
300 Convent Street, Suite 2200
San Antonio, Texas  78205-3792
Telephone:  (210) 224-5575
Facsimile:  (210) 270-7205

Kenneth C. Meixelsperger
State Bar No. 24031596
Fulbright & Jaworski L.L.P.
2200 Ross Avenue, Suite 2800
Dallas, Texas 75201
Telephone:  (214) 855-8100
Facsimile:  (214) 855-8200

Counsel for Defendant GIACOMINI, S.p.A.

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing Joint Motion Submission was served upon the attorney of record for the represented Plaintiffs, and the *Pro Se* Plaintiff to the above case in compliance with Rule 5 of the Federal Rules of Civil Procedure by certified mail, return receipt requested, on August 19th, 2005.

Mr. Charles E. Perry
BALCH, PERRY, RASMUSSEN AND
SOUTHARD
1101 Scott Avenue, Suite 17
P.O. Box 8185
Wichita Falls, Texas  76301-8185

Ms. Sybil Sanchez, *Pro Se*
2928 Cartwright Drive
Haltom City, Texas 76117

John W. Weber, Jr.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## WICHITA FALLS DIVISION

| | |
|---|---|
| JAMES A. BRYANT, AS NEXT FRIEND OF BOBBY JAMES LEE BRYANT, A MINOR; SYBIL SANCHEZ, TEMPORARY ADMINISTRATRIX OF THE ESTATE OF AMANDA BRYANT, DECEASED; SYBIL SANCHEZ, INDIVIDUALLY; BOB LEMMONS & LLOYD LIZAKOWSKI, §§§§§§§§§ | |
| PLAINTIFFS, §§ | **Civil Action No. 7-04CV-114-R (Jury)** |
| V. §§ | |
| GIACOMINI, S.p.A., §§ | |
| DEFENDANT. § | |

## DEFENDANT GIACOMINI, S.P. A.'S BRIEF IN SUPPORT
## OF ITS MOTION FOR SUMMARY JUDGMENT

COMES NOW, Defendant Giacomini, S.p.A. ("Giacomini" or "Defendant") and pursuant to Rule 56 of the Federal Rules of Civil Procedure, files this Brief in Support of Its Motion for Summary Judgment regarding certain claims and causes of action asserted by Plaintiffs James A. Bryant, as Next Friend of Bobby James Lee Bryant, a Minor; Sybil Sanchez, Temporary Administratrix of the Estate of Amanda Bryant, Deceased; Sybil Sanchez, Individually; Bob Lemons; and Lloyd Lizakowski.

## SUMMARY FACTUAL BACKGROUND

This case is based on injuries alleged by Plaintiffs to have occurred on or about June 17, 2002 at 8:00 a.m. *See* Plaintiffs' Original Complaint, ¶4. Plaintiffs allege injuries resulting from

a fire in a trailer in Bowie, Montague County, Texas. *Id.* Plaintiffs Amanda Bryant, Bobby James Lee Bryant (a minor), and Lloyd Lizakowski were present at the time of the fire. *Id.*

Plaintiffs allege that at some time prior to the fire, a space heater had been present in the trailer, but had subsequently been removed. *Id.* A valve between a supply of propane and the space heater remained in place after removal of the space heater. *Id.* Plaintiffs further allege that the minor child, Bobby James Lee Bryant (four years old at the time of the accident), turned the heater valve on allowing propane gas to spread to an ignition source in the trailer. *Id.* Plaintiffs allege the propane gas ignited when Amanda Bryant ignited a cigarette lighter. *See Exhibit 1, Deposition of Dr. Richard E. Forbes ("Forbes Dep.") at p. 71 line 25 through p. 72 line 5.* Bobby James Lee Bryant, Amanda Bryant, and Lloyd Lizakowski suffered burn injuries from the fire. Amanda Bryant eventually died from her injuries. *See* Plaintiffs' Original Complaint, ¶4.

On or about June 14, 2004, Plaintiffs sued Defendant Giacomini, the alleged manufacturer of the valve at issue, for their injuries. *See* Plaintiffs' Original Complaint. Plaintiffs allege causes of action in strict liability for defective design, manufacturing defect, and defective marketing. *See* Plaintiffs' Original Complaint, ¶5-7. Plaintiffs allege causes of action in negligence for defective design, manufacturing defect, and defective marketing. *See* Plaintiffs' Original Complaint, ¶8-12. Plaintiffs further allege Defendant had a post sale duty to warn of defective and unreasonably dangerous conditions of the valve. *See* Plaintiffs' Original Complaint, ¶12-15. Defendant denies Plaintiffs' claims.

## SUMMARY JUDGMENT STANDARD

The utility of summary judgment has been recognized by both the Supreme Court and this Circuit. In *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986), the Supreme Court observed:

> Summary judgment procedure is properly regarded not as a disfavored procedural shortcut but, rather, as an integral part of the Federal Rules as a whole, which are

designed "to secure the just, speedy and inexpensive determination of every action." . . . Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses . . . but also for the rights of persons opposing such claims and defenses to demonstrate, in the manner provided by the rule prior to trial, that the claims and defenses have no factual basis.

The Court also stated:

One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose.

*Id.* at 325. Rule 56 is simply another mechanism under the Federal Rules designed "to secure the just, speedy and inexpensive determination of every action." *Id.* at 329.

*Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1197 (5th Cir. 1986) carries the same theme, "[W]hen appropriate, [summary judgment] affords a merciful end to litigation that would otherwise be lengthy and expensive." Thus, a motion for summary judgment is not only permitted, but actually encouraged as an appropriate part of aggressive case management. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).

To withstand a proper motion for summary judgment, the non-moving party is required to come forward with "specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 586-87; *see also, Celotex*, 477 U.S. at 325. This burden means that the non-movant must produce evidence sufficient to support a judgment in his favor:

[T]here is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986) (citations omitted). The courts must inquire as to whether there is sufficient evidence upon which reasonable jurors could properly find by a preponderance of the evidence that the plaintiff is entitled to a verdict. *Id.* at 251. Moreover, in order to prevent a summary judgment, there must exist more than a scintilla of evidence in support of the Plaintiffs' position. *Id.* The Court must inquire, therefore, as to

whether there is sufficient evidence upon which reasonable jurors could properly find by a preponderance of the evidence that the Plaintiff is entitled to a verdict. *Id.* Mere conjecture alone is insufficient to raise a factual issue sufficient to withstand a proper motion for summary judgment. *See Slaughter v. Allstate Ins. Co.*, 803 F.2d 857, 860 (5th Cir. 1986).

In determining the materiality of the facts, the Court must look to substantive law in order to identify which facts are actually material to the case at hand. *Anderson*, 477 U.S. at 247. Only those disputes regarding facts that might affect the outcome of the suit under substantive law will properly preclude the Court's entry of summary judgment. *Id.* "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

## ARGUMENTS AND AUTHORITIES

Defendant moves for summary judgment on Plaintiffs' design defect, marketing defect, manufacturing defect, post-sale duty to warn, and warranty claims.

### *DESIGN DEFECT*

To recover for a design defect, Plaintiffs must prove the following elements:

- ▸ the product was defectively designed when sold;

- ▸ the product was unreasonably dangerous (weighing the risk and utility) to the user;

- ▸ the product reached the user without substantial change in the condition in which it was sold;

- ▸ the defective and unreasonably dangerous condition of the product that was a producing cause of physical harm to the user; and

- ▸ there was a safer alternative design.

*See, e.g., Jaimes v. Fiesta Mart, Inc.*, 21 S.W.3d 301 (Tex. App. Houston [1st Dist.] 1999, pet. denied); *see also* TEX. CIV. PRAC. & REM. CODE ANN. § 82.005 (Vernon 2002).

Plaintiff asserts both strict liability and negligence claims that Defendant's valve was defectively designed. As sole support of their design defect claims, Plaintiffs rely on expert testimony that the product was defectively designed. In order for the Plaintiffs to rely on expert testimony to support their claims, such expert testimony must be admissible, even at the summary judgment stage. *First United Financial Corp. v. U.S. Fidelity & Guar. Co.*, 96 F.3d 135, 136-37 (5th Cir. 1996) ("The admissibility of expert testimony is governed by the same rules, whether at trial or on summary judgment.").

"Unlike an ordinary witness ..., an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation. ... Presumably, this relaxation of the usual requirement of firsthand knowledge – a rule which represents 'a "most pervasive manifestation" of the common law insistence upon "the most reliable sources of information,"' ... – is premised on an assumption that *the expert's opinion will have a reasonable basis in the knowledge and experience of his discipline.*" *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592, 113 S. Ct. 2786, 2796 (1993) (emphasis added). In general, this requirement that an expert's opinions have a "reasonable basis" in the knowledge and experience of his or her discipline is reflected in Rule 702 of the Federal Rules of Evidence, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

Under now-familiar principles originally established in *Daubert*, district courts must apply Rule 702 in a "gatekeeping" role to ensure that any expert testimony "is not only relevant

but reliable." *Daubert*, 509 U.S. at 589, 113 S. Ct. at 2795. Thus, "[t]his role requires the district judge to undertake a two-part analysis. The district judge must first determine whether the proffered testimony is reliable, requiring an assessment of whether the reasoning or methodology underlying the testimony is scientifically valid. Second, the district judge must determine whether that reasoning or methodology can be properly applied to the facts in issue; that is, whether it is relevant." *Curtis v. M&S Petroleum, Inc.*, 174 F.3d 661, 668 (5th Cir. 1999). The relevance inquiry is also sometimes described as requiring the district court to "evaluate whether there is an adequate 'fit' between the data and the opinion proffered." *Moore v. Ashland Chemical, Inc.*, 151 F.3d 269, 276 (5th Cir. 1998).

The determination of whether expert testimony is sufficiently reliable is a "fact-specific inquiry." *Burleson v. Texas Dept. of Criminal Justice*, 393 F.3d 577, 584 (5th Cir. 2004). The *Daubert* Court identified four frequently cited factors that may bear on reliability, including "whether the expert's theory or technique: (1) can be or has been tested; (2) has been subjected to peer review and publication; (3) has a known or potential rate of error or standards controlling its operation; and (4) is generally accepted in the relevant scientific community." *Id.* "The four factors identified in *Daubert* form the starting point of the inquiry into admissibility of expert testimony. ... However, 'the factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony.'" *Id.* (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150, 119 S. Ct. 1167, 1175 (1999)); *see also* Fed. R. Evid. 702. Regardless of the particular factors considered, "[t]he objective of th[e] [gatekeeping] requirement is to ensure the reliability and relevancy of expert testimony. It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of

intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire,*

526 U.S. at 152, 119 S. Ct. at 1176.

Finally, it is important to note that "the party seeking to have the district court admit

expert testimony must demonstrate that the expert's findings and conclusions are based on the

scientific method, and, therefore, are reliable. ... The proponent need not prove to the judge that

the expert's testimony is correct, but she must prove by a preponderance of the evidence that the

testimony is reliable." *Moore v. Ashland Chemical,* 151 F.3d at 276.

Plaintiff's rely on the expert testimony of Dr. Richard Forbes. Forbes puts forth three

opinions regarding the alleged design defects of the subject valve:

1.      The handle on the valve is easy enough to turn that a four-year-old is able to turn

it. *See Forbes Dep. p. 153, lines 6-13.*

2.      The red color of the handle is attractive to children. *See Forbes Dep. p. 99, line 20

through p. 100, line 5.*

3.      The valve had a lever handle rather than a square handle that would require the

use of a wrench or other tool to turn it. *See Forbes Dep. p. 153, lines 6-22.*

As discussed below, none of these opinions meets the requirements of *Daubert.* Thus, each of

these opinions is not admissible and cannot support Plaintiffs' design defect claims.

*Opinion 1.*

Forbes has never been involved in the design of gas cutoff valves. *See Forbes Dep., p.

36, lines 10-12, p. 145, lines 12-15.* Indeed, Forbes has never been involved in the design of any

kind of gas valves. *See Forbes Dep., p. 36, lines 13-16.* He has never been retained as an expert

in any case involving cutoff valves. *See Forbes Dep., p. 32, lines 9-12.* Forbes admits that he has

never seen the valve that was involved in the accident that is the subject of this lawsuit. *See

Forbes Dep., p. 56, lines 13-16.* Thus, Forbes could not have tested what force was required to

open such valve. *Id.* Forbes admits that he has not purchased an exemplar valve. *See Forbes Dep., p. 83, lines 9-13.* Forbes admits that he has done no studies to determine if a four-year-old could open the valve, though he admits that such a study could be done. *See Forbes Dep., p. 84, line 4 through p. 85, line 5.* In fact, Forbes admits that he has not done anything to determine if a four-year-old could open the valve. *See Forbes Dep., p. 84, lines 8-12.* Furthermore, Forbes had done nothing to determine if the minor-plaintiff could have opened the specific valve in question. *Id.* Yet, it is Forbes' opinion that the valve involved in the accident that is the subject of this lawsuit was defectively designed because a four-year-old could open it.

Forbes' first opinion falls woefully short of the requirements of *Daubert*. In *Watkins v. Telsmith, Inc.,* 121 F.3d 984, 990 (5th Cir. 1997), the Fifth Circuit applied the principles of *Daubert* to a design defect case. In *Watkins*, a wire rope supporting a conveyor system failed, causing part of the conveyor to fall on the plaintiff, killing him. *Id.* at 986. Plaintiff offered expert testimony that the support for the conveyor was defectively designed and that it should have been supported by two wires, or by some other appropriate means. *Id.* The trial court excluded the experts opinions and the Fifth Circuit agreed. *Id.* at 992. The Fifth Circuit noted that the expert did not test his theories, nor even perform any calculations to establish his theory of design defect or that his suggestions would have prevented the accident. *Id.* The Fifth Circuit also noted that the expert never inspected the wire rope that failed. *Id.*

Similarly, in *Dancy v. Hyster Co.,* 127 F.3d 649, 652 (8th Cir. 1997), the Eighth Circuit found it proper to exclude expert testimony that was unreliable because the expert's theory of design defect had not been tested, although it could have been. *Dancy* involved a forklift accident wherein the plaintiff was pinned by the forklift he was operating when it overturned. *Id.* at 651. The plaintiff alleged that the forklift was defective because it did not have a cage around

the operator's compartment that would have prevented his accident. *Id.* In *Dancy*, the expert at issue was Forbes – the same expert proffered by Plaintiffs in this lawsuit. *See Id.* In *Dancy*, Forbes admitted that he had never designed a forklift or other similar machine. *Id.* Forbes theorized that the forklift should have had a guard to keep the plaintiff's leg within the forklift. *Id.* Forbes admitted that he had not tested his theory in any way, that he had not seen the device he suggested on any forklift, and that he had never designed such a device. *Id.* The trial court disallowed Forbes' testimony, finding it unreliable, and the Eighth Circuit upheld that decision. *Id.* at 652.[1]

Because Forbes has done no studies to determine whether a four-year old could open the valve at issue in this case, Forbes' opinion that the valve can be opened by a four-year old is unreliable and nothing more than speculation. Much like he did in the *Dancy* case, Forbes has put forth untested theories of design defect about matters with which he has no design experience. His opinion on whether a four-year old can open such valve (1) has not been tested; (2) has not been subjected to peer review and publication; (3) does not have a known or potential rate of error or standards controlling its operation; and (4) has not been shown to be generally accepted in the relevant scientific community. Thus, Forbes' opinion is not reliable under *Daubert.* Because Forbes' opinion fails to meet the standards expressed in *Daubert,* it is no more than conjecture. Conjecture is insufficient to raise a factual issue sufficient to withstand a motion for summary judgment. Thus, Plaintiffs' claim of defective design cannot be supported by Forbes opinion that a four-year old could open the valve at issue in this case.

---

[1] Forbes' opinions have also been disallowed on similar grounds in *Watkins v. U-Haul International, Inc.*, 770 So. 2d 970, 977 (Miss. App. 2000).

*Opinion 2.*

Forbes admits that he has done no studies to determine if children would be attracted to the red valve handle. *See Forbes Dep., p. 99, line 20 through p. 100 line 5.* Forbes bases his opinion that the valve was defectively designed because of the red color of the handle on the fact that he has "raised three children and help[ed] raise three grandchildren." *Id.* Even so, that anecdotal experience of Forbes only leads him to believe that his children and grandchildren are attracted to "bright colors." *See Forbes Dep., p. 100, lines 6-9.*

Like Forbes' first opinion, Forbes' opinion that the red color of the handle is attractive to children is unreliable and no more than conjecture. His opinion (1) has not been tested; (2) has not been subjected to peer review and publication; (3) does not have a known or potential rate of error or standards controlling its operation; and (4) has not been shown to be generally accepted in the relevant scientific community. Forbes' opinion is merely anecdotal based on his experience with his own children or grandchildren being attracted to "bright colors." Thus, Forbes' opinion is not reliable under *Daubert.* Plaintiffs' claim of defective design cannot be supported by Forbes opinion that the red color of the handle is attractive to children.

*Opinion 3.*

Forbes asserts that if a valve with a square handle had been installed, i.e., a handle that requires a wrench to turn, a four-year-old could not turn the handle and open the valve. *See Forbes Dep., p. 89, line 11 through p. 92, line 1.* Forbes further opines that a square-handled valve would have prevented the accident at issue in this case, and no unreasonably dangerous condition would have existed. *See Forbes Dep., p. 93, lines 5-15; p. 99, lines 10-19.* Forbes purports that Defendant offers no such valve in the same size as the valve at issue in this case. *See Forbes Dep., p. 92, lines 2-13.* Thus, Forbes opines that installers, who are responsible for choosing the valve to install, have no choice but to use lever-handled valves as opposed to

square-handled valves because the square handled valves are not available. *See Forbes Dep., p. 95, line 22 through p. 96, line 24.*

Defendant Giacomini does offer a square-handle for the valve at issue. *See Exhibit 2, Correspondence dated May 18, 2005, at p.2 and attached exhibit* (supplementing response to Request for Production No. 8 by producing engineering drawings concerning optional handles available for the type of valve at issue).[2] The basis for Forbes' third opinion – that Giacomini does not offer a square handle – is therefore incorrect. Forbes further speculates, however, that even with a choice, an installer would not appreciate the type of accident involved in this lawsuit. *See Forbes Dep., p. 96, lines 17-24.* Forbes, however, admits that he has done no studies whatsoever to determine what installers of this type of valve know or do not know with regard to accidents like that involved in this lawsuit. *See Forbes Dep., p. 97, line 23 through p. 98, line 24.* Indeed, he specifically states that his opinion on what installers may or may not appreciate is not "scientific" but instead merely anecdotal. *See Forbes Dep., p. 98, lines 13-16.* Forbes' third opinion, that the valve at issue in this lawsuit is defectively designed because a square-handle was not available, is fatally flawed in that Giacomini does indeed offer a square-handle and Forbes has conducted no studies or analyses to determine what type of handles installers would choose to install. Indeed, Forbes readily admits that there are different applications that would warrant one handle over the other. *See Forbes Dep., p. 155, lines 3-7.*

Plaintiffs proffer three opinions of their expert Forbes as evidence that Defendant's valve was defectively designed. Forbes' opinions, however, are unreliable and therefore inadmissible per *Daubert.* Forbes' opinions amount to no more than speculation or conjecture. Without Forbes

---

[2] The deposition of Servilio Gioria, as representative for Defendant Giacomini, was taken July 20, 2005. Mr. Gioria confirmed the availability of the square-handle for the valve that is the subject of this lawsuit. The transcript of Mr. Gioria's testimony is not yet available as of the time of the filing of this pleading. Once available, such testimony will be referenced either by supplement to this pleading or by reply to Plaintiff's Response to this pleading.

opinions, Plaintiffs have presented no evidence that the valve in question was defectively designed. Therefore, Defendant is entitled to summary judgment on Plaintiffs' design defect claims.

Furthermore, none of Forbes' opinions regarding design defect can overcome that in this particular case, the valve was not installed per applicable codes and had it been so installed, the accident would not have occurred. Forbes admits that the applicable code required that the valve should have been capped because it was not connected to an appliance. *See Forbes Dep., p. 94, lines 8-16, p. 147, line 24 through p. 148, line 18.* Forbes further acknowledges that the valve was not capped. *See Forbes Dep., p. 81, lines 3-8.* Forbes further admits that in his opinion, Thermagas (the entity that connected gas to the trailer) was negligent for failing to cap the valve at issue. *See Forbes Dep., p. 151, lines 12-16, p. 156, lines 1-13, p. 157, line 18 through p. 158, line 4.* Finally, Forbes admits that this accident would not have occurred had Thermagas fulfilled its duty. *See Forbes Dep., p. 156, lines 6-13.* Therefore, despite Forbes' unreliable design defect opinions, it is undisputed that had the valve at issue been installed per code, this accident would not have occurred.

## *DEFECTIVE MARKETING*

In any marketing defect ("failure-to-warn") case, the claimant must show both that the warning was defective and that it was the producing cause of the claimant's injury. *Wyeth-Ayerst Lab. Co. v. Medrano,* 28 S.W.3d 87, 94 (Tex. App.—Texarkana 2000, no pet.); see *General Motors v. Saenz,* 873 S.W.2d 353, 359 (Tex. 1993). The elements of a marketing defect cause of action are:

- ► a risk of harm must exist, which risk is inherent in the product or that may arise from the intended or reasonably anticipated use of the product;

- the product supplier must actually know or reasonably foresee the risk of harm at the time the product is marketed;

- the product must possess a marketing defect;

- the absence of a warning and/or instruction must render the product unreasonably dangerous to the ultimate user or consumer of the product; and

- the failure to warn and/or instruct must constitute a causative nexus in the product user's injury.

*USX Corp. v. Salinas*, 818 S.W.2d 473, 482- 83 (Tex. App.—San Antonio 1991, writ denied).

In the case at hand, Plaintiffs have produced no evidence that there was any marketing defect regarding the valve at issue. Neither have the Plaintiffs demonstrated that a defective warning was the producing or proximate cause of their injuries. Plaintiffs have designated Forbes as their sole liability expert in this matter. Forbes denies having any opinions concerning warnings in this matter. *See Forbes Dep., p. 162, lines 4-6.*

Because Plaintiffs have not proffered any evidence in support of their defective marketing claims, Plaintiffs have not demonstrated specific facts showing that there is a genuine issue for trial. Accordingly, summary judgment is appropriate on Plaintiffs' defective marketing claims.

## *MANUFACTURING DEFECT*

A product has a manufacturing defect when it contains a flaw, that is, it "deviates, in terms of its construction or quality, from the specifications or planned output in a manner that renders it unreasonably dangerous." *American Tobacco Co. v. Grinnell*, 951 S.W.2d 420, 434 (Tex. 1997); *see also* RESTATEMENT (THIRD) OF TORTS—PRODUCTS LIABILITY § 2 & cmt. c (1998) (defining a manufacturing defect as a "departure from a product unit's design specifications"). The flaw requirement must exist whether the manufacturing defect is alleged in

negligence or strict liability. *Simms v. Southwest Tex. Methodist Hosp.*, 535 S.W.2d 192, 197

(Tex. Civ. App.—San Antonio 1976, writ ref'd n.r.e.). Thus, a plaintiff claiming a manufacturing

defect must prove three elements:

- the product did not conform to the manufacturer's plans and specifications;

- the deviation from plans and specifications made the product unreasonably dangerous; and

- the flaw was a producing cause of the injuries for which recovery is sought.

*Torrington Co. v. Stutzman*, 46 S.W.3d 829, 844 (Tex. 2000); *Grinnell*, 951 S.W.2d at 434.

In the case at hand, Plaintiffs have produced no evidence that there was any

manufacturing defect regarding the valve at issue. Neither have the Plaintiffs demonstrated that a

manufacturing defect was the producing or proximate cause of their injuries. Because Plaintiffs

have not proffered any evidence in support of their manufacturing defect claims, Plaintiffs have

not demonstrated specific facts showing that there is a genuine issue for trial. Accordingly,

summary judgment is appropriate on Plaintiffs' manufacturing defect claims.

### POST-SALE DUTY TO WARN

It is well settled Texas products liability law that, absent special circumstances, a

manufacturer has no duty to warn about or recall a product due to hazards discovered after the

product has been manufactured and sold. *Syrie v. Knoll Int'l*, 748 F.2d 304, 311 (5th Cir. 1984).

Instead, a manufacturer's duty to warn, if one exists, is determined at the time the product leaves

the manufacturer. *Id.* (stating that "[t]he failure to warn about risks posed by a product *at the*

*time it is manufactured and sold* may form the basis for imposing liability on a manufacturer")

(emphasis added); *General Motors Corp. v. Saenz*, 873 S.W.2d 353, 356 (Tex. 1993) (stating

that "[t]he determination of whether a duty to warn exists is made *as of the time the product*

*leaves the manufacturer*") (emphasis added); *Burroughs Wellcome Co. v. Crye*, 912 S.W.2d 251, 255-56 (Tex. App.—El Paso 1994), *rev'd on other grounds*, 907 S.W.2d 497 (Tex. 1995) (explaining that duty to warn requires, as a predicate, that the risk of harm be known or reasonably foreseeable by product supplier at time of marketing); *USX Corp. v. Salinas*, 818 S.W.2d 473, 483-84 (Tex. App.—San Antonio 1991, writ denied) (stating that "a product supplier is not liable for a failure to warn of dangers which were unforeseeable at the time the product was marketed or sold"); and *Bell Helicopter Co. v. Bradshaw*, 594 S.W.2d 519 (Tex. App.—Corpus Christi 1979, writ ref'd n.r.e.) (noting that the trier of fact must first determine that the product was unreasonably dangerous when sold before the manufacturer can be held liable for failure to warn or recall).

Texas law provides only two instances in which a post-sale duty to modify, warn and/or recall may arise. If such an exception is applicable, a post-sale duty may be alleged through both traditional negligence and strict products liability claims. Whether a manufacturer has a post-sale duty, under either theory, is a question of law. *Torres v. Caterpillar, Inc.*, 928 S.W.2d 233 (Tex.App.—San Antonio 1996, writ denied).

The first exception to the above-stated general rule arises when a manufacturer, subsequent to the product's manufacture and original sale, regains a significant degree of control over the product, which is determined to be unreasonably dangerous during that period of regained control. *Bell Helicopter Co. v. Bradshaw*, 594 S.W.2d 519, 531 (Tex.App.ÿCorpus Christi 1979, writ ref'd n.r.e.). In *Bradshaw*, the court of appeals found that the manufacturer, Bell, re-acquired a significant degree of control over the helicopter after its original sale in 1961 as a result of the helicopter's being acquired by an authorized Bell service station. Because it was during that time of regained control that a defect regarding the rotor blade at issue was

discovered, and also that the replacement blade was developed, the court held that Bell had the duty to replace the old rotor blade with the safer rotor blade, which had already been designed and manufactured. *Bradshaw*, 594 S.W.2d at 530-531. Key to the *Bradshaw* opinion is the defendant's reacquisition of control of the alleged defective product. In that regard, the Fifth Circuit in *Syrie* noted:

> On its face, *Bradshaw* might be said to evince a broadening of the manufacturer's standard of care to include a duty to issue warnings or recall products once the manufacturer produced a design known to be safer than the one employed previously. Such a reading of the case disregards the essential finding that the manufacturer, *having lost control of the helicopters when originally placed in the stream of trade, regained a significant degree of control for products liability purposes when the helicopter was purchased by an authorized service station of the manufacturer.*

*Syrie*, 748 F.2d at 311 (emphasis added) (footnote omitted). Furthermore, the *Bradshaw* court itself limited the reach of its holding, stating:

> [t]his Court does not adopt the rule ... that a manufacturer is under a continuing duty to improve its product, nor is it necessary for us to hold in this case that a manufacturer has a duty to remedy dangerous defects in a product which are not discovered until after manufacture and sale.

*Bradshaw*, 594 S.W.2d at 521-32.

The second exception to the general rule against a post-sale duty to recall a product or to warn states that a manufacturer may be found negligent for the breach of a post-sale duty if it is established that the manufacturer assumed such otherwise non-existent duty and then did not use reasonable means to discharge that duty. *Dion v. Ford Motor Co.*, 804 S.W.2d 302, 310 (Tex.App.-Eastland, 1991, writ denied). If such a duty is assumed by the manufacturer, it must also be established that the plaintiff's injury is a proximate result of the breach of that assumed duty. *Dion*, 804 S.W.2d at 309. In the absence of such an assumption of duty, a negligence cause of action against a manufacturer based on post-sale duty to modify, warn and/or recall cannot be maintained. *See Dion*, 804 S.W.2d at 310 ("before holding a manufacturer negligent for breach

of a post-sale duty, it must be established that a manufacturer assumed a duty and then did not use reasonable means to discharge the duty"); *Bradshaw*, 594 S.W.2d at 519.

Unlike the facts in *Bradshaw* or *Dion*, Plaintiffs have no evidence that Defendant Giacomini ever regained any control over the valve at issue in this matter. Likewise, Plaintiffs have no evidence that Defendant Giacomini ever assumed any post-sale duties regarding the valve at issue in this case. Thus, Plaintiffs have no evidence to support the primary elements of a claim for breach of post-sale duties: that the defendant regained control of the product or that the defendant assumed a post-sale duty. Accordingly, Defendant is entitled to summary judgment against Plaintiffs claims of breach of post-sale duties.

## *WARRANTY*

While Plaintiffs did not include a specifically numbered and labeled section entitled "Express Warranty", they apparently are asserting an express warranty claim. *See Plaintiffs' Original Complaint, ¶17.* Plaintiffs' purported express warranty claim must fail as a matter of law because Plaintiffs have no evidence to support the elements of this cause of action.

To recover for the breach of an express warranty, Plaintiffs must prove:

- an express affirmation of fact or promise by the seller relating to the goods;

- that such affirmation of fact or promise became a part of the basis of the bargain;

- that the plaintiff relied upon said affirmation of fact or promise;

- that the goods failed to comply with the affirmations of fact or promise;

- that the plaintiff was injured by such failure of the product to comply with the express warranty; and

- that such failure was the proximate cause of plaintiff's injury.

*Morris v. Adolph Coors Co.*, 735 S.W.2d 578, 587 (Tex. App.—Fort Worth 1987, writ ref'd n.r.e.). As explained more fully *supra*, there is no evidence of defect of any kind. There is no evidence to support any other element of the express warranty claim. Accordingly, Defendant is entitled to summary judgment in its favor on this cause of action.

Plaintiffs additionally contend Defendant breached an implied warranty of fitness for a particular purpose. *See Plaintiff's Original Complaint, ¶¶ 17-18*. In this case, as explained *supra*, there is no evidence of any defect; therefore, there can be no viable claim for breach of an implied warranty of fitness for a particular purpose. *See, e.g., Elliott v. Kraft Foods N. Am., Inc.*, 118 S.W.3d 50 (Tex. App.—Houston[14th] 2003, no pet.). Defendant is entitled to summary judgment in its favor on Plaintiffs' warranty causes of action.

## CONCLUSION

Plaintiffs proffer the opinions of their expert Forbes as evidence that Defendant's valve was defectively designed. Forbes' opinions, however, are unreliable and therefore inadmissible under the tenets of *Daubert*. Absent Forbes opinions, Plaintiffs have presented no evidence that the valve in question was defectively designed. Therefore, Defendant is entitled to summary judgment on Plaintiff's strict liability and negligent design defect claims.

Plaintiffs have produced no evidence that there was defect in manufacturing or marketing of the valve that is the subject of this lawsuit. Therefore, Defendant is entitled to summary judgment on Plaintiff's strict liability and negligent manufacturing and marketing defect claims.

Finally, Plaintiffs have not demonstrated that Defendant owed any post-sale duties to Plaintiffs. Therefore, Defendant is entitled to summary judgment on Plaintiff's post-sale duty claims.

**PRAYER**

WHEREFORE, PREMISES CONSIDERED, Defendant Giacomini respectfully requests

that this Court grant its Motion for Summary Judgment on the above-enumerated claims and for

such other and further relief as it shall be justly entitled.

Respectfully submitted,

John W. Weber, Jr.
State Bar No. 21046500
Joseph A. Bourbois
State Bar No. 00790342
Fulbright & Jaworski L.L.P.
300 Convent Street, Suite 2200
San Antonio, Texas  78205-3792
Telephone:  (210) 224-5575
Facsimile:  (210) 270-7205

Kenneth C. Meixelsperger
State Bar No.  24031596
Fulbright & Jaworski L.L.P.
2200 Ross Avenue, Suite 2800
Dallas, Texas 75201
Telephone:  (214) 855-8100
Facsimile:  (214) 855-8200

Counsel for Defendant GIACOMINI, S.p.A.

## CERTIFICATE OF SERVICE

This pleading, Defendant's Brief in Support of Its Motion for Summary Judgment, was served in compliance with Rule 5 of the Federal Rules of Civil Procedure by Federal Express on July _25th_, 2005.

Mr. Charles E. Perry
BALCH, PERRY, RASMUSSEN AND
SOUTHARD
1101 Scott Avenue, Suite 17
P.O. Box 8185
Wichita Falls, Texas  76301-8185

Mr. Gregory L. Underwood
LAW OFFICE OF GREGORY L. UNDERWOOD
607 Lindsay Street, Suite B
Bowie, Texas  76230


_____
John W. Weber, Jr.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION

| | | |
|---|---|---|
| JAMES A. BRYANT, AS NEXT FRIEND OF BOBBY JAMES LEE BRYANT, A MINOR; SYBIL SANCHEZ, TEMPORARY ADMINISTRATRIX OF THE ESTATE OF AMANDA BRYANT, DECEASED; SYBIL SANCHEZ, INDIVIDUALLY; BOB LEMMONS & LLOYD LIZAKOWSKI,<br><br>PLAINTIFFS,<br><br>V.<br><br>GIACOMINI, S.p.A.,<br><br>DEFENDANT. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No. 7-04CV-114-R<br>(Jury) |

## DEFENDANT GIACOMINI, S.P. A.'S MOTION
## FOR SUMMARY JUDGMENT

COMES NOW, Defendant Giacomini, S.p.A. ("Giacomini" or "Defendant") and pursuant to Rule 56 of the Federal Rules of Civil Procedure, files this Motion for Summary Judgment regarding certain claims and causes of action asserted by Plaintiffs James A. Bryant, as Next Friend of Bobby James Lee Bryant, a Minor; Sybil Sanchez, Temporary Administratrix of the Estate of Amanda Bryant, Deceased; Sybil Sanchez, Individually; Bob Lemons; and Lloyd Lizakowski.

## SUMMARY

Defendant Giacomini seeks summary judgment on the following claims:

1. Strict Liability

2. Negligence

3. Post Sale Duty to Warn

4.  Warranty

The elements of the above claims on which Defendant seeks summary judgment will be set forth in Defendant's Brief in Support of its Motion for Summary Judgment.

The legal and factual grounds on which Defendant relies will be set forth in Defendant's Brief in Support of its Motion for Summary Judgment.

Defendant's Motion and Brief is supported by the exhibits attached thereto.

Respectfully submitted,

John W. Weber, Jr.
State Bar No. 21046500
Joseph A. Bourbois
State Bar No. 00790342
Fulbright & Jaworski L.L.P.
300 Convent Street, Suite 2200
San Antonio, Texas 78205-3792
Telephone: (210) 224-5575
Facsimile: (210) 270-7205

Kenneth C. Meixelsperger
State Bar No. 24031596
Fulbright & Jaworski L.L.P.
2200 Ross Avenue, Suite 2800
Dallas, Texas 75201
Telephone: (214) 855-8100
Facsimile: (214) 855-8200

Counsel for Defendant GIACOMINI, S.p.A.

## CERTIFICATE OF SERVICE

This pleading, Defendant's Motion for Summary Judgment, was served in compliance with Rule 5 of the Federal Rules of Civil Procedure by Federal Express on July _25th_ , 2005.

Mr. Charles E. Perry
BALCH, PERRY, RASMUSSEN AND
SOUTHARD
1101 Scott Avenue, Suite 17
P.O. Box 8185
Wichita Falls, Texas  76301-8185

Mr. Gregory L. Underwood
LAW OFFICE OF GREGORY L. UNDERWOOD
607 Lindsay Street, Suite B
Bowie, Texas  76230

John W. Weber, Jr.

30958134 1

- 3 -

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION

JAMES A. BRYANT, AS NEXT FRIEND    §
OF BOBBY JAMES LEE BRYANT, A       §
MINOR; SYBIL SANCHEZ,              §
TEMPORARY ADMINISTRATRIX OF        §
THE ESTATE OF AMANDA BRYANT,       §
DECEASED; SYBIL SANCHEZ,           §
INDIVIDUALLY; BOB LEMMONS &        §
LLOYD LIZAKOWSKI,                  §        Civil Action No.  7-04CV-114-R
                                   §                  (Jury)
      PLAINTIFFS,                  §
                                   §
V.                                 §
                                   §
GIACOMINI, S.p.A.,                 §
                                   §
      DEFENDANT.                   §

## ORDER

On _____, 2005, came on for hearing Defendant Giacomini, S.p.A.

("Giacomini") Motion for Summary Judgment.

All parties appeared through counsel of record and announced ready.  The Court

considered the Motion for Summary Judgment, Plaintiffs' Response thereto, the pleadings, the

summary judgment evidence, and the arguments of counsel, and the Court finds that Defendant's

Motion for Summary Judgment should be granted.  It is therefore

ORDERED, ADJUDGED and DECREED that the Motion for Summary

Judgment filed on behalf of the Defendant is granted as to Plaintiffs' claims of strict liability,

negligence, breach of express and implied warranty, and post sale duties.  It is further

ORDERED, ADJUDGED and DECREED that Plaintiffs take nothing from

Defendant by way of such claims for relief.  It is further

ORDERED, ADJUDGED and DECREED that all other relief sought in this action, not granted in this order, is denied.

SIGNED AND ENTERED this the _____ day of _____, 2005.

_____
JUDGE PRESIDING



UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION

| | |
|---|---|
| JAMES A. BRYANT, AS NEXT §<br>FRIEND OF BOBBY JAMES LEE §<br>BRYANT (A MINOR); SYBIL §<br>SANCHEZ, TEMPORARY §<br>ADMINISTRATRIX OF THE ESTATE §<br>OF AMANDA BRYANT, DECEASED §<br>SYBIL SANCHEZ, INDIVIDUALLY; §<br>BOB LEMMONS AND LLOYD §<br>JAMES LIZAKOWSKI §<br>**Plaintiffs** §<br>§<br>**V.** §<br>§<br>**GIACOMINI, S.p.A.** §<br>**Defendant** § | **NO. 7-04-CV-114-R** |

PLAINTIFFS' RESPONSE TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT

COMES NOW, the Plaintiff, James Bryant, etal, and files this the Response to the

Defendant's Motion For Summary Judgment.

## I. INTRODUCTION

The facts of the case are that in the early morning hours of July 17, 2002, a 4 year old boy,

Bobby Bryant, was playing with a cat near a Giacomini gas valve on the floor of a travel trailer at

Bowie, Texas. Bobby turned the valve on and when his mother, Amanda, struck her cigarette lighter

while sitting on a couch in the direct line of the gas valve, a small fire explosion ensued. The gas

valve was hooked to a line of propane coming off of the kitchen range. The subsequent fire and

explosion killed Amanda, as she ultimately died in the Parkland Burn Center. Little Bobby was out

of direct line of the gas valve flow and was slightly burned. Lloyd Lizakowski, a resident of the travel

trailer, was blown out the screen door and came back in and saved Bobby and Amanda. He was burned on 30 percent of his body (Lizakowski Deposition pp. 69-78; 137-141; 147-149).

The Defendant, Giacomini, has filed for summary judgment by asking this Court to disallow the testimony of the Plaintiffs' expert witness, Dr. Richard Forbes, who has stated that the design of the gas valve handle is defectively designed. Dr. Richard Forbes, the Plaintiffs' expert witness has attacked the design of the handle as being too easy to accidentally or inadvertently turn on and also that the industry has a safer alternative design.

## SUMMARY JUDGMENT STANDARD

The Federal Rules of Civil Procedure permits a summary judgment when there is "no genuine issue as to any material fact and...the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 A "genuine issue is one that can be resoled only by the trier of fact because it may be resolved in favor of either party. *Anderson v Liberty Lobby, Inc.*, 477 U.S. 242 (1986). A "material" fact is one that can affect the outcome of the suit under the governing substantive law. *Id.* At 248. The substantive law will determine which facts are material. *Id. See also Douglas v. USAA,* 79 F.3d 1415, 14232 n. 11 (5th Cir. 1996); *One Nat'l Bank v. Antonellis,* 80 F.3d 606, 608 (1st Cir. 1996). In evaluating the facts based upon the applicable substantive law the court must resolve all reasonable doubts about the facts in favor of the non-movant. *Ham v Squire,* 81 F.3d 973 (10th Cir. 1996); *Pochia v. NYNEX Corp.* 81 F.3d 275, 277 (2d Cir. 1996). Here, the Texas law of strict product liability applies, however, the Federal Rules of Evidence govern the admissibility of evidence.

## The Product (Giacomini Lever Handle Gas Valve) Design and Guard Duty

The product that is the subject of this suit is a Giacomini lever handle gas valve. As with most

product liability claims, a manufacturer owes the public a duty of identifying potential hazards associated with the product and its use. Once a hazard is identified then the duty of the manufacturer is to design out the hazard if possible. In this case the gas valve is designed to regulate the flow of highly flammable gases like propane. The plaintiffs do not complain of the valve but do complain of the handle (lever), which they contend is too easy to accidently or inadvertently turn on, as was the case here.

The defendant Giacomini has a duty to guard against the accidental or inadvertent turning on of the gas valve if they are to produce such a lever handle. The defendant Giacomini has notice of this hazard and design defect because they product several devices that will guard against the accidental or inadvertent turning on of the gas. That is, the defendant Giacomini has a duty to <u>design out</u> this alleged hazard and if they cannot do so then they must <u>guard</u> against this hazard.

Well, the defendant Giacomini has done both, but the unfortunate thing is that the design that would have prevented this event and the guarding mechanisms were not part of the subject valve.

The design that would have prevented this event was a square or lockable handle and the guarding mechanisms are (1) cap attached by a chain and a handle locking device. *All these alternative designs and safety mechanisms are made by the defendant Giacomini and are available.*

The defendant's expert Dr. Stephen Winder was asked about these alternative designs and safety mechanisms and he had to say as follows:

### Lockable Handle

Again, Dr. Winder was asked about a safer alternative design by seeing if he agreed with the testimony a Giacomini engineer, (Mr. Gioria) gave in a previous deposition.

Mr. Gioria testified that Giacomini has a lockable handle for their valves (Winder Deposition

Plaintiff's Response To Defendant's Motion For Summary Judgment

3

p. 122, lines 1-7). He says also that the lockable handle is a square handle (Winder Deposition p. 122, lines 8-18). Dr. Winder concedes that the purpose of the square handle is to lock it down (Winder Deposition p. 122, lines 19-25).

Dr. Winder was asked the following question:

"Q.   And if you had that type of valve and handle on this particular case, then, there wouldn't be much of a chance of it being accidentally or inadvertently opened?

A.   That's certainly true. It would cover that particular thing."

He went on to say that this would cause other problems, such as not being able to turn it off quickly (Winder Deposition p. 123, lines 8-13).

## Cap and Chain

A main contention of the Defendant, Giacomini, is that the subject gas valve should have been capped since it was not in use. Giacomini makes caps or plugs that are attached to valves with a chain for other valves that they make (Exhibit 11). Dr. Winder, the Defendant's expert, states that the valve is supposed to be capped and this cap and chain would have the effect of "just saying here's the cap." (Winder Deposition p. 114, lines 8-21). Dr. Winder, when asked about the cap and chain said the following:

"Q.   Steve, would you concede that the technology to put in this chain and cap on this valve could be applied to a flared fitting at Giacomini?

A.   Yes. I'm just saying it's not there as far as I can see that it's being offered for that."

(Winder Deposition p. 116, lines 13-17)

### Separate Cap And Chain

When asked about a safety cap and chain that Giacomini makes for other valves and whether it could be applied to the subject valve, Dr. Winder concedes that it could (Winder Deposit p. 119, lines 2-25; p. 120, lines 1-3).

Giacomini sells a cap and chain safety device separate and apart from any of their valves. (Exhibit 11). When asked about this cap and chain and whether it could be applied to the subject valve, Dr. Winder said that of course the technology could be applied. (Winder Deposition p. 120, line 20-25; p. 121, lines 1-17).

(Winder Deposition p. 123, lines 1-7).

### Locking Device

The Defendant, Giacomini, sells a device that is placed over some of the valves in their product line to prevent the valve from being opened accidentally. This locking device is depicted by (Exhibit 13). When asked to describe this device, Mr. Gioria, an engineer for the Defendant Giacomini, described in a previous deposition the locking device as follows:

"Q.    What is the purpose of this locking device?

A.    It's for ball valves used in the hydronic field. Hydronic is heating.

Q.    And the function of the valve allows the valve to be either locked in an open or a closed position?

A.    That's correct."
(Winder Deposition p. 123, lines 23-25; p. 124, lines 1-7).

When asked whether this particular locking device would work on the subject valve, Dr. Winder states "It sort of indicates to me that it would probably work on the subject valve." (Winder

Plaintiff's Response To Defendant's Motion For Summary Judgment

5

Deposition p. 125, lines 1-23).

## Mr. Gioria, Giacomini's Chief Engineer

Mr. Gioria is chief engineer for all products with the Defendant Giacomini. (Gioria Deposition p. 3, lines 8-21).

It would take less than 10 foot (inch pounds) to turn the valve and substantially less than 20 (Gioria Deposition p. 21, lines 22-25; p. 22, lines 1-16).

Mr. Gioria thinks that the square or lockable handle would prevent the accidental or inadvertent turning on of the gas valve. (Gioria Deposition p. 33, lines 10-16).

When asked if a lever handle Giacomini gas ball would be more likely to be accidentally or inadvertently turned on than one with a square handle? He answered as follows:

"A.     No, all ball valves have a lever handle – or gas valves have a lever – a lever handle. So that is why there – COULD BE A RISK (Emphasis Added.) (Gioria Deposition p. 35, line 1-8).

When asked if the R747 locking device could be adapted to a consumer lever gas ball handle Mr. Gioria said it--could--but it is not necessary. You have the square type gas ball valve that you could put wire through. (Gioria Deposition p. 44, lines 8-18).

## Plaintiff Expert Richard Forbes

The defendant Giacomini has attacked the plaintiffs' expert Richard Forbes and his opinions with respect to the reliability of his methodology. Under the test laid down by the Supreme Court in *Daubert v. Merrell Dow Pharmaceutical, Inc.,* 509 U.S. 579 (1993) the Court said that the trial court is to determine (1) whether the expert will testify to valid scientific or other expert knowledge based on sound methodology and (2) whether the testimony will assist the trier of fact with a fact at issue. Daubert 509 U.S. at 592.

<u>Daubert</u> 509 U.S. at 592.

Also, in *Daubert*, the Court identified four factors as "general observations" for assessing the reliability of proffered expert testimony. The Court indicated that a key factor was whether the theory has been tested. *Daubert* 509 U.S. at 593.

In the later case of <u>Kumbo Tire Co.  V Carmichael</u>, 526 U.S. 137 At 150 (1999), the U.S. Supreme Court emphasized that the <u>Daubert</u> analysis is a "flexible" one, and that "the factors identified in <u>Daubert</u> may or may not be pertinent in assessing reliability, depending on the nature of the issue, the experts's particular expertise, and the subject of his testimony". The District Court's responsibility is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the court room the same level of intellectual rigors that characterizes the practice of an expert in the relevant field. <u>Kumbo Tire Co.  V Carmichael</u>, 526 U.S. 137 at 152 (1999).

In a case such as this one, however, it is appropriate for the trial Court to consider factors other than those listed in <u>Daubert</u> to evaluate the reliability of the expert's testimony.  In this case, the expert's testimony is based mainly on his personal observations, professional experience, education and training.  The trial Court, therefore, must probe into the reliability of these bases when determining whether the testimony should be admitted. <u>Pepitone v Biomarix, Inc., etal,</u> 288 F.3rd 239.

The advisory committee notes to Rule 702 specifically contemplate this approach:

Nothing in this amendment is intended to suggest that experience alone or experience in conjunction with other knowledge, skill, training or education may not provide sufficient foundation for expert testimony.  To the contrary, the text of Rule 702 expressly contemplates that an expert may

be qualified on the basis of experience. <u>Fed. R. Evid. 702, Advisory Committee's note.</u>

The Defendant attacked the Plaintiff's expert because he did not know that the Defendant made the square handle knob that would have prevented the accidental or inadvertent turning of the gas valve involved in this case. (Winder Deposition p. 116, lines 18-24; p. 117, lines 1-25; p. 118, lines 1-8; p. 122, lines 1-25; p. 123, lines 8-13). The valve was not found in the Defendant's web site; however, Dr. Forbes did identify the same square lockable handle from B & K Industries, a Giacomini distributor. As to whether the square lockable handle, which is the alternative safer design is a Giacomini gas valve, one cannot say for sure. (Exhibit 3).

The defendant Giacomini has engineered, tested, built and sold an alternative safer designed gas valve with a square and lockable handle as outlined above by Giacomini's expert witness, Dr. Stephen Winder (Winder Deposition p. 116, lines 18-24; p. 117 lines 1-25; p. 118 lines 1-8; p. 122 lines 1-25; p. 123 lines 8-13). The alternative safer design of a gas valve has been made already.

In deciding whether an alternative design is appropriate, an expert is appropriate, an expert needs to look at a number of considerations: "the degree to which the alternative design is compatible with existing systems...; the relative efficiency of the two designs; the short and long-term maintenance costs associated with the alternative design would have on the price of the machine." *Cummins v. Lyle Industries*, 93 F. 3d 362 at 369. However, with respect to testing on Giacomini lever handle gas valves, Dr. Forbes did extensive testing on an exemplar Giacomini lever handle gas valve.. Dr. Forbes found other manufacturer's that produced the square (knob) handle (Exhibit 3) which is the alternative safer design.

The Defendant Giacomini attacks Dr. Forbes' opinion that a four year old could turn the subject valve. Dr. Forbes' testing as set out herein proves his opinion is valid as well as the

Plaintiff's Response To Defendant's Motion For Summary Judgment

testimony of Mr. Lizakowski, who was in the fire and with four year old Bobby Bryant (Lizakowski Deposition p. 71, lines 4-25; p. 72, lines 1-9; p. 73, lines 18-25; p. 74, lines 1-5; p. 137, lines 13-25; p. 137, lines 1-111; p. 148, lines 23-25; p. 149, lines 1-4; p. 147, lines 1-22; p. 148, lines 1-16; p. 148, lines 17-22).

## Testing Gas Burning Equipment

Dr. Forbes has had extensive experience testing equipment that may have ben involved in fires. On a regular basis he has personally tested various types of gas burning appliances, such as water heaters, furnaces and space heaters (Forbes Deposition p. 14, lines 24-25; p. 15, lines 1-8) with respect to testing gas burning equipment, Dr. Forbes has experienced assembling piping systems that involve the testing of various propane furnaces and water heaters. (Forbes Deposition p. 18, lines 22-25; p. 19, lines 1-10).

## Testing Gas Valve Handle

Dr. Forbes has tested an exemplar gas valve handle which is similar to the subject valve which is not available. The ANSI standards require that a valve handle can not require more than 20 inch pounds of turning torque to open. His testing found that the gas valve turned at much less than the ANSI requirement. His testing found that the gas valve opened at less than four inch pounds and roughly in the area of two to three inch pounds of turning torque. (Forbes Deposition p. 81, lines 16-25; p. 82, lines 1-25). The actual testing was accomplished by using a calibrated scale using normal weights and pulling on the handle until it started to turn and then noted what kind of force it took to turn. (Forbes Deposition p. 81, lines 16-25; p. 82, lines 1-25; p. 83, lines 1-25; p. 84, pages 1-3).

Plaintiff's Response To Defendant's Motion For Summary Judgment

9

When asked to elaborate further about the testing he did on the exemplar  gas valve, Dr.

Forbes stated as follows:

"Q.    Now, tell us again about this test that you did on the difficulty of

turning on an exemplar of Giacomini gas ball valve.

A.    Okay. I basically used an exemplar valve that you provided to me. It's a half-inch valve of the type in question.   I simply came out an inch from the center of the screw that holds the handle on and provided a force to that handle in a perpendicular direction with a calibrated scale that I have. And I noted what point the valve handle started to turn and read the weight involved in pulling it or the force involved in pulling it.  And then essentially using one inch for distance, the torque is basically one times whatever the scale reads –

Q.    All right.

A.    – in inch pounds.

Q.    All right.  And what inch pounds did it take to move it?

A.    Well, it veered a little bit, because I was holding it in my hand and so forth. But, basically, I think the readings I got was somewhere between two and three pounds.

Q.    All right.  And that complied with the ANSI 21.15 standards, did it not?

A.    Which is only how much maximum can it take to turn it.

Q.    That's what?  Twenty-five?  Twenty?

A.    For this size valve, I believe it's 25.

Q.    And that's a size higher than the subject valve, is it not?

A.    I think the subject valve perhaps has a half-inch pipe thread coming into it with relief of a 3/8ths flare.  But, anyway, we're talking about either 20- or 25-inch pounds.

Q.    Dr. Winder said it was 20.

A.    He said 20. I would accept that.

Q.    So that's, what, about a tenth as much?

A.    It takes maybe a ninth or tenth or so of the effort allowed at the maximum level.

Q.    Okay.

A.    And I don't believe – I just noticed in looking at the drawing for this valve, I don't believe, in what I can tell right now – and this would be a question that the people could answer. It doesn't appear to me that there's any adjustable way that the torque can be set on these valves. It has to be set by holding manufacturing tolerances, I believe.

Q.    So it's set at the manufacturer –

A.    It would obviously be set at time of manufacture, but I don't believe I see any features that makes it adjustable. So it has to be manufactured to tolerance.

Q.    Are you familiar with the type of force that it would take to put two to three measurements or – what did you call it?

A.    Pounds of torque. Torque is force times the distance. But, now, the handle is longer than an inch. So if it takes two pounds, say, at an inch, it's going to take less out at the end of the handle.

Q.    All right. Are you familiar with how much force a torque two to three pounds is?

A.    It's fairly small, typical. And, again, I couldn't find anything in *Human* Factors information that I had available to me to deal with what sort of turning effort a four-year-old child might be able to do. I believe they would be able to open this valve. That's my testimony.

Q.    Give us some example of what two or three pounds of effort would be other than a child. I mean, like, lifting this pen?

A.    There is a statement that water is a pint a pound a world around, which is just about right. A pint of water weighs right at a pound. So if you want to perorate through that, you're looking at two pints of water or a quart of water out at a distance of one inch on that handle to turn it.

Plaintiff's Response To Defendant's Motion For Summary Judgment

11

Q.    Okay. So would it be a fair statement to say that if a child can lift two quarts or a half gallon of water, he can turn that handle?

A.    I believe they could."

## Opinion On Gas Valve

Dr. Forbes gave an opinion as to why the gas valve was defective. He did not think that the valve itself was defective, but only the handle as the way it was designed and used on the valve (Forbes Deposition p. 95, lines 5-20).

His opinion went further as to say that the square knob or screwdrive slot knob would have prevented this accident. He states as follows:

"Q.    In this instance, as I understand your testimony, the valve itself isn't defective. It's the handle, that you say, creates a defect?

A.    The ease at which it can be opened and certainly that would – the longer you make the handle, the easier it is to open, of course. And, again, my test on one valve that I've done indicates that the valve, in my opinion, is relatively – that I have tested is relatively easy to open and is not nearly as hard to open as it could be, leading to the manufacturer, and still meet the standard. But, you know, it's my firm belief that had a valve put this square knob or even a screwdriver slot in it to turn it in the infrequent uses that it sees would have certainly prevented this accident, in my opinion."

(Forbes Deposition p. 95, lines 9-20).

## Difficulty In Testing

Dr. Forbes disagrees that Dr. Winder found an exemplar valve hard to turn. He found in the standard that there was no minimum torque and that the standard ANSI § 21.15 that you don't want it (handle) too hard to turn (Forbes Deposition p. 126, lines 12-25).

## Daubert Testing

Dr. Forbes has designed a pre-engineered metal building and is involved in the

alternative design for several products that he has actually designed and tested. (Forbes Deposition p. 167, lines 3-5; p. 169, lines 13-14).

He (Dr. Forbes) acknowledges the need to test an alternative design that is proposed (Forbes Deposition p. 168, lines 17-25; p. 169, lines 1-4). He further states in this particular case the alternative design has already been built here and that being the square handle valve that harder to turn (Forbes Deposition p. 169, lines 1-14). Dr. Winder confirms this. (Winder Deposition p. 116, lines 18-24; p. 117, lines 1-25; p. 118, lines 1-8; p. 122, lines 1-25; p. 123, lines 8-13).

When asked about the case of <u>Dancy v Hyster</u> involving forklifts in which he was not allowed to testify, he explained that there is a requirement for <u>testing</u> and that in some cases plaintiff's attorneys just don't want to provide the <u>resources to allow testing</u> that is desired. (Forbes Deposition p. 16, lines 24-25; p. 168 lines 1-16).

### Square Handle

Since one of the main issues of this case is whether the subject valve is too each to turn on accidentally or inadvertently and whether there is a safer alternative design. Dr. Winder, the Defendant expert, was asked about some safer alternative designed valve handles. Dr. Winder, when asked to identify some safer valve handles with respect to how hard it would be to turn them on, identified two. (Exhibit 5) (Winder Deposition p. 116, lines 18-24; p. 117, lines 1-25; p. 118, lines 1-8.)

Dr. Winder even goes so far as to identify a particular handle that would require a wrench to turn it on (Exhibit 5). When asked the question about the difficulty of an alternative design, he said the following:

"Q.    So the two that you're saying would be more difficult to turn on would be the T-handle and the flat square handle?


A.    Yeah. In fact, I think the flat square handle probably is going to take A wrench to turn it on or else you're not going to get it on."

Even though the catalog in which their valves were identified were not necessarily Giacomini valves, Dr. Winder says that Giacomini makes those valves (Winder Deposition p. 117, lines 20-24).

### Bobby Bryant (4 year old) And The Valve

At the time of the explosive event that caused the fire Bobby was playing in front of the coffee table playing with the cat (Lizakowski Deposition p. 71, lines 4-25; p. 72, lines 1-9; p. 73, lines 18-25; p. 74, lines 1-5).

During the time Mr. Lizakowski lived in the trailer the gas valve was never turned on (Lizakowski Deposition p. 135, lines 3-8).

Prior to hooking up service to the trailer, Mr. Lizakowski checked to see if the gas valve was hard to turn on and he found that it was <u>easy</u>. (Lizakowski Deposition p. 137, lines 13-25; p. 1137, lines 1-11).

When asked about Bobby and why he was not burned very bad, Mr. Lizakowski stated as follows:

"Like I said, there was – when I went back, it looked like a rolling ball of fire. I – and it was coming from down at the floor area. So, I felt like it was coming out of the line. And you could see the flame. There was just – like I say, it was rolling over there in that corner because it would hit that wall and roll back.

And Bobby was where it probably wasn't going to hit him. Amanda was right there at the – on the right hand side of the couch about halfway down the couch. And that's why she got burned as bad as she did because it was rolling right at her."
(Lizakowski Deposition p. 140, lines 20-25; p. 141, lines 2-6).

### Bobby (4 year old) Turned The Valve On

When asked about how Bobby could have turned the gas valve on, Mr. Lizakowski

stated as follows:

"The only – the only – that's the only person that could have turned it on. He was the only one anywhere near it. I feel like – and I feel that gas had to be on to be – for that ball of fire to be boiling up like it was.

Lizakowski Deposition p. 148, lines 23-25; p. 149, lines 1-4).

When Mr. Lizakowski was in the Bellmire Home in Bowie, Texas, recovering from his

burn injuries, he had an opportunity to speak with one of the nurses who was a friend of

Amanda's sister. (Lizakowski Deposition p. 147, lines 1-22). This nurse supposedly said that

little Bobby had said that Mommy was not coming home because she is mad because I turned

the gas on (Lizakowski Deposition p. 148, lines 1-16) Mr. Lizakowski then acknowledged that

he did not know if this was true or not, and it was second or third hearsay. (Lizakowski

Deposition p. 148, lines 17-22).

### Circumstantial Evidence

There is an older line of cases that allow a product liability case to be proved by

circumstantial evidence. These cases are mainly manufacturing defect cases, but could overlap

with design defect cases.

The issue is whether or not a product liability case under the strict liability doctrine can

be proved by circumstantial evidence. The Texas Supreme Court in McKisson v Sales

Plaintiff's Response To Defendant's Motion For Summary Judgment

Affiliates, Inc. 416 S.W.2d 787 (Tex.  Sup., 1967) extended the strict liability doctrine to

products other than foodstuffs by saying that to exclude circumstantial evidence that the product

was defective at the time of the sale would frustrate the beneficial purposes of the doctrine.  It

would be equally difficult, if not impossible, for the Plaintiff to rebut by direct evidence all the

conceivable possibilities which would account for the defective condition other than the

existence of the defect at the time of the sale.  Such direct evidence should not be required,

particularly when dealing with a latent defect.

In the case of Darryl v Ford Motor Co.  440 S.W.2d 630, the Supreme Court of Texas

held that a push rod that will bend to such an extent that it will not activate the braking system

is "unreasonably dangerous"in a truck.

Although both *Daubert* and *Kumho* set forth certain factors that a judge "may" consider

in performing this so-called "gatekeeping" function, a "definitive checklist or test" is not

mandated.  The Supreme Court in *Kumho* stated:

> Our emphasis on the "may" thus reflects *Daubert's* description of the Rule 702
> inquiry as "a flexible one" 509 U.S. 594.  *Daubert* makes clear that the factors it
> mentions do not constitute a "definitive checklist or test." Id.  At 593.  And *Daubert*
> adds that the gatekeeping inquiry must be "tied to the facts" of a particular "case." Id.
> At 591 (quoting *United States v Downing,* F.2d 1224, 1242 (CA3 1985).  We agree
> with the Solicitor General that "the factors identified in *Daubert* may or may not be
> pertinent in assessing reliability, depending on the nature of the issue, the expert's
> particular expertise, and the subject of his testimony." Brief for the United States as
> Amicus Curiae 19.  The conclusion, in our view, is that we can neither rule out, nor
> rule in, for all cases and for all time the applicability of the factors mentioned in
> *Daubert,* nor can we now do so for subsets of cases categorized by category of expert
> or by kind of evidence.  Too much depends upon the particular case at issue.  Id.  At
> 150.

In short, the Court must determine if the expert testimony is both relevant and reliable

depending n the nature of the issue, the expert's particular expertise, and the subject of his testimony. See *Pipitone v Biomatrix, Inc.,* 288 F.3d 239 (CA5 2002) which gives a good analysis of the application of this standard in allowing an expert to testify and render opinions on causation.

One of the theories plead by Plaintiffs for strict liability, negligence and breach of warranty is that the subject gas valve handle was too easy to turn, making accidental or inadvertent turning likely.

Design defects may arise in a number of ways such as the faulty assembly of a product *Signal Oil & Gas v Universal Oil Prods.,* 572 S.W.2d 320 (Tex. 1978), faulty packaging, *Waller v Coca-Cola Bottlers Ass'n.* 523 S.W.2d 306 (Tex. Civ. App.-Houston [1ˢᵗ Dist] 1975 no writ), inadequate mat4erial, *Fitzgerald Marine Sales v Leunes,* 659 S.W.2d 917, 918 (Tex. App.-Ft. Worth 1983, writ dism'd) or impure material, *Shamrock Fuel & Oil Sales Co.  v  Tunks,* 416 S.W.2d 779 Tex. 1967). Although the burden for design defects remains with the plaintiffs, the extent of that proof, at least as to technical matters, is altered because the plaintiff in this count is only attacking the design of the defective product.  Therefore, technical issues are correspondingly simplified because the parties are only haggling over a safer alternative design.  Design cases are somewhat, but not totally, expert driven matters that necessarily must be proven by the admission of extensive opinion testimony.  See *Darryl v Ford Motor Co.,* 440 S.W.2d 630, 632 (Tex. 1969) ([i]t cannot be seriously contended that a push rod that...will not activate the braking system is not 'unreasonably dangerous'.") See also, *C. A.  Hoover & Son v.  O.M. Franklin Serum Co.* 444 S.W.2d 596 (Tex. 1969).  If the product fails to perform s intended or malfunctions causing injury to the plaintiff then a strict liability situation is created.  Additionally, design defect may be proven without the necessity of expert testimony.  For example, *Pittsburg Coca-Cola Bottling Works v Ponder,* 4343 S.W.2d 546 (1969), the Texas

Plaintiff's Response To Defendant's Motion For Summary Judgment

Supreme Court reviewed the history of "exploding bottle cases" and noted "[t]his is not to say that proof of the defect must be made by direct or opinion evidence' it usually can only be made by circumstantial evidence." Id. At 548. Therein, the court held that the jury may resolve such issues based on the facts of the case:

> We hold that the respondent's testimony will support a reasonable inference that the exploded Coca Cola bottle was not mishandled or damaged after it had been delivered to her by petitioner, and thus that the bottle was defective when delivered. To hold otherwise would be to invade the province of the jury and determine the credibility of respondent as a witness. Id. At 549-550.

## SUMMARY

The Defendant Giacomini makes alternative safer designs of gas valves with andles that are not subject to accidental or inadvertent turning on, as was the case here. The gas valve in this case was too easy to turn on as Dr. Richard Forbes proves by his testing of an exemplar model. Two to three with pounds of torque is virtually nothing as to the difficulty in turning a Giacomini gas valve on. The fact that Giacomini has alternative safer designs as do others in the industry, as well as caps or plugs that are attached to the gas valve puts Giacomini on notice of this hazard. Dr. Forbes is well qualified to prove the defect in this Giacomini gas ball valve when you consider his background and testing as well as the fact that Giacomini and others in the industry make a gas ball valve with a handle that is a safer alternative.

Respectfully submitted,

Charles E. Perry
Balch, Perry, Rasmussen and Southard
1101 Scott Avenue, Suite 17
Wichita Falls, Texas 76301
Telephone:    (940)  761-3344
Facsimile:     (940)  761-3355


_____
Charles E. Perry
State Bar No. 15799700
Attorney For The Plaintiff


## CERTIFICATE OF SERVICE

This pleading, Declaration In Support Of Plaintiff's Response To Defendant's Motion For

Summary Judgment, was served in compliance with Rule 5 of the Federal Rules of Civil Procedure

by _____5_____ on _August_, 2005.


John W. Weber, Jr,.                      Kenneth C. Meixelsperger
Fulbright & Jaworski, LLP                Fulbright & Jaworski, LLP
300 Convent Street, Suite 2200           2200 Ross Avenue, Suite 2800
San Antonio, Texas 78205-3792            Dallas, Texas 75201


_____

Charles E. Perry